**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240216-U

Order filed July 23, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0216 Circuit No. 09-CF-1224 |
| LUIS VILLAVINCENCIO-SERNA, | ) ) ) | Honorable Michael W. Reidy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court.
Justices Holdridge and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court erred when it denied defendant's motion for leave to file a successive postconviction petition alleging actual innocence.

¶ 2     Defendant, Luis Villavincencio-Serna, appeals from the denial of his motion for leave to file a successive postconviction petition. He argues that the circuit court's decision was erroneous because his motion adequately pled a colorable claim of actual innocence. We reverse and remand for further proceedings.

¶ 3                                I. BACKGROUND

¶ 4        The facts of defendant's underlying criminal trial have been set forth in *People v. Villavincencio-Serna*, 2014 IL App (2d) 120668-U. We repeat only those facts necessary for the disposition of this appeal.

¶ 5        At around 3:30 a.m. on May 16, 2009, Armando Huerta, Jr., was shot and killed as he walked from the parking lot of an apartment building toward the building itself. Defendant was charged with first degree murder in connection with Huerta's death.

¶ 6        Numerous witnesses testified at trial, including Juan Carlos Marines Rojas, who testified that he was with Huerta at the time of the shooting. Rojas stated, *inter alia*, that he and Huerta had been sitting in a car in the parking lot, drinking beer and listening to music. Rojas had approximately eight beers by the time they got out of the car to walk into the apartment building. As they were walking, Rojas heard a car drive past them and then gunshots. Rojas admitted that he initially told the police that the car was a dark blue or dark green Honda. However, when he was taken to a secure parking lot by the police, he identified a gray or silver car as the one from which the shots were fired. On the stand, he stated that the shots came from a gray or silver car.

¶ 7        Josephina Vasquez testified that at the time of the shooting, she was 16 years old and was dating defendant. Initially, she told the police that defendant had shot Huerta. However, she claimed that she did so only because the police yelled at her and threatened her with jail time. She appeared in two video recordings in which she identified defendant as the shooter, although she was not consistent about where she was at the time the shooting occurred. In the first recording, she stated that she was in her apartment and went to bed around 2 a.m., and that defendant left and returned at 5 a.m. When he returned, he told Vasquez that he had "taken care of business." In the second recording, Vasquez stated that she, Michael Daddio, Donald Rogers, and defendant drove

to her apartment building during the early morning hours of May 16, 2009. Defendant had a black gun in his waistband, which he took out and cocked when they arrived in the parking lot. They drove around the parking lot twice with the car's headlights off before defendant told her to duck. He reached over her and fired approximately five shots.

¶ 8    At trial, Vasquez testified that she was with defendant in his apartment in Chicago at the time of the shooting.

¶ 9    Daddio testified that at the time of the shooting, he owned a silver 1993 Cadillac DeVille. The car had some front-end damage. He also testified that he could not recall what he did on the night of May 15, 2009, although he did admit that he sold the Cadillac on May 16. On May 17, the police took him from his place of employment and interviewed him. He signed a *Miranda* form at 3:53 p.m., but a video recording of him being interviewed by police did not begin until 9:25 p.m. Daddio testified at trial that the police threatened him for hours, stating, *inter alia*, that they would take him away from his family and would ensure his younger brother knew he had been part of a murder. The threats led him to tell the police that he was driving his car with defendant, Vasquez, and Rogers as passengers on May 16 when defendant fired shots.

¶ 10    On the stand, Daddio denied being present at the time of the shooting and denied being with defendant or Vasquez at any point on May 16.

¶ 11    Rogers testified that he was at home on May 16. The police picked him up from his uncle's house on May 17 and interviewed him. Rogers alleged that the officers yelled at him, hit the desk, and threatened him with 35 years of imprisonment if he did not cooperate. They removed his glasses at one point during the interview. They also asked him whether he wanted to see his mother again. Rogers denied being at the apartment building on May 16 several times, but the police told him he was lying. In the portion of Rogers's interview that appeared on video, Rogers stated that, on

May 16, he, defendant, and Vasquez were passengers in Daddio's car when defendant fired shots. However, Rogers testified at trial that everything he told the police on May 17, as well as on June 26 when he spoke to the police again, was a lie. On the stand, he testified that he did not see defendant shoot Huerta.

¶ 12     Several police officers and a State's Attorney testified that no one yelled at or threatened any of the individuals who were interviewed. The stipulated testimony of a forensic scientist was also admitted at trial. That scientist would have testified that he tested samples taken from Daddio's car and defendant's hands and that he concluded that either defendant did not fire a gun in Daddio's car or the gunshot residue had somehow been removed.

¶ 13     Other testimony presented at trial indicated that another vehicle was in the area around the time of the shooting—a dark green Pontiac Bonneville driven by Paul Alvarado and containing Daniel Garcia, David Vargas, and Maritza Padilla. Alvarado claimed that he dropped off Padilla and someone ran up to the car and kicked it. Rather than retaliate, Alvarado drove off with Garcia and Vargas.

¶ 14     Defendant was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and was sentenced to 50 years of imprisonment. On direct appeal, the Second District affirmed defendant's conviction and sentence, ruling, *inter alia*, that the evidence presented at trial was sufficient to convict defendant despite the recantations of Vasquez, Daddio, and Rogers. *People v. Villavincencio-Serna*, 2014 IL App (2d) 120668-U. Subsequently, in November 2014, defendant filed a *pro se* postconviction petition, which the circuit court summarily dismissed. The Second District affirmed the summary dismissal of defendant's postconviction petition in *People v. Villavincencio-Serna*, No. 2-15-0212 (2017) (unpublished minute order under Illinois Supreme Court Rule 23(c)).

4

¶ 15 In November 2022, defendant filed a motion for leave to file a successive postconviction petition. He withdrew his motion one year later.

¶ 16 In December 2023, defendant filed, through counsel, a new motion for leave to file a successive postconviction petition in which he alleged actual innocence. In part, defendant alleged that an eyewitness, Juvenal Abarca Reyes, did not speak with the police after the shooting because he was an undocumented immigrant and because he feared retaliation against himself and his family by the individuals he observed. Attached to the petition were two statements given by Reyes to the police in 2022 and 2023. In the 2022 statement to a criminal investigator from the Du Page County Public Defender's Office, Reyes stated that he observed a blue or green four-door sedan driving slowly through the parking lot with its lights off. From his bedroom window, he saw three males in the car, whom he believed made eye contact with him. As Reyes sat back on his bed, he heard approximately nine gunshots. He did not see the shooter, but he assumed the individuals in the car were shooting at him, so he ducked and told his wife to get herself and their kids down. Reyes identified a green 1994 Pontiac Bonneville as the car he saw that night. When shown a photo of Daddio's car, Reyes said that it could not have been the vehicle he saw because the car was not silver and did not have front-end damage. Reyes signed an attestation regarding the 2022 statement.

¶ 17 In the 2023 statement, which did not contain any attestation, Reyes spoke at his apartment with a private investigator and a defense attorney regarding what he saw on May 19, 2009. Reyes demonstrated what happened that night, explaining that he saw a dark blue or green four-door car driving slowly with its lights off. He stated that he saw a person's arm extend from the rear passenger side as that person exited the car and fired approximately 9 to 10 shots. He saw flashes of light coming from a firearm as he fell backwards onto his bed in an attempt to avoid being shot.

¶ 18    The petition also alleged that Padilla, who left for Mexico shortly after the shooting and was described by the State at trial as being unavailable to testify due to visa issues, was in the United States and now available to testify. Padilla, who had been interviewed by police within minutes of their arrival at the scene, told them that when Alvarado dropped her off shortly before the shooting, Huerta kicked the rear passenger side of Alvarado's vehicle. Padilla also told police that she called Alvarado several minutes later from her apartment, heard gunshots, and went outside to observe that Huerta had been shot. However, phone records attached to the petition indicated that she placed the call to Alvarado *after* the shooting was reported in a 911 call.

¶ 19    Padilla was interviewed twice in 2022 by an investigator with the public defender's office. Her statements were consistent with what she told the police shortly after the shooting. However, a statement given by her mother was interpreted by defendant as potentially placing Padilla outside and witnessing the shooting itself. In part, defendant alleged that "[Padilla's] flight from the country shortly after the shooting is extremely suspicious and strongly suggests she knows much more about the facts of the shooting."

¶ 20    In February 2024, the circuit court issued a written order regarding defendant's petition. The court identified the issue to be decided as "whether the petition for successive postconviction relief should be granted or denied."

¶ 21    After summarizing the trial testimony, the court set forth the law regarding actual innocence claims and then summarized the evidence defendant claimed in his petition to be newly discovered. The court then proceeded to apply the actual innocence standard. Regarding Reyes's proposed testimony, while the court concluded that the evidence was material and noncumulative, it was silent on whether the evidence was newly discovered. The court ultimately focused, however, on whether the evidence was conclusive.

6

¶ 22    The court found that Reyes's proposed testimony did not undermine its confidence in the guilty verdict. Of particular importance to the court were the "remarkably similar stories" that Vasquez, Daddio, and Rogers told to the police about defendant being the shooter, especially because Rogers denied that the police told him what to say about what happened, and despite their later recantations. The court also noted that Rojas, "who would have had the best view of the shooting," identified the shots as coming from Daddio's silver Cadillac without any prompting by the police. The court weighed this testimony against Reyes's proposed testimony—that the shots came from a blue or green car without front-end damage—and noted that the few seconds that Reyes had to view the shooting and the 15 years that had passed were "both too little and too much time to give greater weight to Reyes' testimony than that of Vasquez, Daddio, and Rogers when weighing the evidence presented in this motion against the evidence that was presented at trial."

¶ 23    The court also found that Padilla's testimony would be of questionable value, as her location at the time of the shooting varied between witnesses. Additionally, the court noted that the petition did not include an affidavit from Padilla indicating she would exonerate defendant and implicate Vargas, despite defendant's claims to the contrary in his petition.

¶ 24    The court also noted the inconsistencies in the witnesses' testimony presented at trial and found that the similar stories of Vasquez, Daddio, and Rogers carried the most weight. Thus, the court concluded that defendant was unable to show that a new trial would be more likely than not to result in an acquittal. Accordingly, the court ruled that his "petition for successive postconviction relief is DENIED."

¶ 25    After defendant's motion to reconsider was denied, he appealed.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, defendant argues that the circuit court erred when it denied his motion for leave to file a successive postconviction petition. More specifically, he argues that the circuit court improperly determined the merits of his postconviction petition rather than merely determining whether the petition set forth a colorable claim of actual innocence. While defendant's successive postconviction petition cited the testimony of numerous witnesses who did not testify at trial, his argument focuses on the proposed testimony of Reyes. He asserts that the court failed to take his well-pled allegations as true and improperly made credibility determinations in arriving at its ruling.

¶ 28    We review a circuit court's denial of a motion for leave to file a successive postconviction petition that alleges actual innocence *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 40.

¶ 29    The Post-Conviction Hearing Act (Act) provides a remedy for a prisoner who alleges that a substantial denial of his or her federal or state constitutional rights occurred in the proceedings resulting in his or her conviction. 725 ILCS 5/122-1(a)(1) (West 2022). The Act contemplates the filing of only one petition. *Id.* § 122-1(f). However, the prohibition on successive petitions will be relaxed if the petitioner either (1) establishes cause and prejudice for failing to bring the claim earlier or (2) asserts that a fundamental miscarriage of justice has occurred due to the petitioner's actual innocence. *Robinson*, 2020 IL 123849, ¶ 42.

¶ 30    Before a petitioner will be allowed to file a successive postconviction petition, he or she must obtain leave of court. *Id.* ¶ 43. "A request to file a successive petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit." *Id.* However, the standard is lower than the substantial showing a petitioner must make at the second stage to warrant an evidentiary hearing on the claim. *Id.*

¶ 31    When the successive petition alleges actual innocence, as in the instant case, leave to file that petition "should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id*. ¶ 44. A petition sets forth a colorable claim of actual innocence when "the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id*.

¶ 32    Significantly, at this stage of postconviction review, all well-pled allegations in the petition and supporting affidavits are to be taken as true unless they are positively rebutted by the record. *Id.* ¶ 45. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60 (noting, as well, that new evidence is not positively rebutted by the record simply because it conflicts with evidence presented at trial). Additionally, the circuit court is prohibited from making any factual or credibility determinations at this stage of review. *Id.* ¶ 45.

¶ 33    There are three requirements for establishing a claim of actual innocence. *Id*. ¶ 47. First, the supporting evidence must be newly discovered; *i.e.*, it must have been discovered after trial and could not have been discovered earlier if due diligence had been exercised. *Id.* Second, the supporting evidence must be material and not merely cumulative to evidence presented at trial. *Id.* Third, and most importantly, the supporting evidence must be of such a conclusive character that it would probably change the result on retrial. *Id.*

¶ 34    Regarding whether Reyes' testimony was newly discovered, we note that Reyes did not come forward because he was an undocumented immigrant and because he feared for the safety of himself and his family from the individuals in the green car. Reyes apparently made himself

9

unavailable as a witness and there is no indication that defendant could have discovered Reyes' proposed testimony earlier than he did. *Cf. People v. Ortiz*, 235 Ill. 2d 319, 334 (2009) (holding that proposed testimony was newly discovered when the witness was not seen by defendant and made himself unavailable by moving out of state). Accordingly, we hold that Reyes' testimony was in fact newly discovered evidence.

¶ 35    Next, we note that the State does not contest whether Reyes's proposed testimony was material and noncumulative. Further, we do not believe it can reasonably be contested that the proposed testimony was relevant and probative of defendant's alleged innocence and that it would be additive to the evidence the fact-finder heard at trial. See generally *Robinson*, 2020 IL 123849, ¶ 47 (defining material and noncumulative evidence).

¶ 36    Our last task is to determine whether Reyes' proposed testimony was of such a conclusive character that it would probably change the result on retrial.

> "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. [Citation.]" *Id.* ¶ 48.

In essence, Reyes' proposed testimony was that the shots were fired by an individual who was in a dark blue or green car that did not have any front-end damage. This case largely hinged on identification of the car from which the shots were fired; if the fact-finder believed the car was the dark green Pontiac Bonneville, defendant could not have been the shooter. We offer no opinion on which vehicle identification was more credible, as we are prohibited from making factual or

10

credibility determinations at this stage (*id.* ¶ 45), but we note that several other witnesses also testified regarding the presence of a dark blue or green car around the time of the shooting.

¶ 37 We find nothing in the record to positively rebut Reyes's proposed testimony; accordingly, we are obligated to take defendant's well-pled facts as true. See *id.* Further, we find that Reyes's testimony, if believed, could sway the fact-finder in favor of an acquittal. See *Id.* ¶ 73 (holding that new evidence that conflicts with, but is not positively rebutted by, the State's identification testimony provides support for allowing the petitioner to proceed on a colorable claim of actual innocence). Under these circumstances, we hold that the circuit court erred when it denied defendant's motion for leave to file a successive postconviction petition. See *id.* ¶ 83. Thus, we reverse that ruling and remand for further proceedings on defendant's successive postconviction petition.

¶ 38 III. CONCLUSION

¶ 39 The judgment of the circuit court of Du Page County is reversed and the cause is remanded for further proceedings.

¶ 40 Reversed and remanded.

11